The next case on the calendar is Waramu et al. v. Industrial Bank of Korea. You have Mr. Travers for the appellants. I see you have reserved two minutes for rebuttal, and you can begin Mr. Travers whenever you're ready. Thank you. Thank you. May it please the court. My name is Jeffrey Travers on behalf of the appellant plaintiffs. As you're aware, our case has many similarities with the Hochberg case, so I don't want to repeat any of the arguments. But the court did ask what were the errors of law in the district court's opinion. Number one, I want to highlight under NOREX, NOREX I think is very applicable to this case because it further explains step one in the Irigori analysis. And under NOREX, the court noted that the district court erred by importing the step three analysis into the step one. So I think the district court here also did that, and I think that's a clear error of law. If you read the district court's opinion on step one, part of that analysis is comparing where the evidence is located between Korea and between New York. But under NOREX, a proper analysis is to determine whether there's more evidence in New York versus Plaintiff's Home Forum. And clearly, there's more evidence in New York in this case. Explain that. How is there more evidence in New York? Again, assuming you have to prove for a fraudulent conveyance claim the underlying fraud, how would that evidence be in the United States versus Korea? Well, we have the benefit of the deferred prosecution agreement in this case, and the deferred prosecution agreement to which IBK was required to stipulate to explains how the US government gathered the evidence to support the criminal action. Again, this is the question I asked in the last argument. What makes you think that whatever evidence the government gathered is going to be available in the United States to civil plaintiffs? What basis is there for believing that that file is going to be produced so that you're not going to need to get those documents in Korea? Well, because it was IBK that gathered the documents and produced them to the prosecutors in New York. So IBK has that evidence. So I think it's just going to be in the course of normal discovery. How about witnesses? Well, there's employees of IBK New York that are still in the US. There's a number of other banks that IBK funneled money through in New York. The transfers into the United States, I don't think, are the disputed part of the case. It's whether or not there was some intent to defraud, right? I don't think, although obviously there would be witnesses in the United States who could say, yes, these transfers occurred into the United States on these dates. That's not what the underlying case would be about, right? Well, I think that would be- That doesn't prove any fraud. That just proves that the transfers went through the banks, right? Well, I think it would be important to find out how those transfers managed to slide through the detection of the other US banks as well. I think that would provide some evidence of the fraud. But also- The New York State Department of Financial Services was involved as well? What was that investigation? It was parallel to the US's investigation. Basically, the- The state must have felt there was some New York connection. Yes, certainly. What is the New York connection that the DFS was looking into is what I'm asking you. Oh, yes. So, yeah, for branch banks in New York, they're required to set up a system, an adequate system that's able to detect terrorism funds flowing through the US. And if those terrorism funds are detected, they're supposed to be seized and held, and held specifically for attachment by judgment creditors of the plaintiffs. And so it was an eight-year investigation by New York, and just repeated findings of IBK's New York failure to set up an adequate system to detect these fraudulent transfers. And that goes to New York's interest in this case. The district court found New York had no interest in this case. But clearly, an eight-year investigation, I think, signals a strong interest in this case. Do you concede that there's a possibility that Korean law, under the conflicts of law principles, Korean law might have to be applied to this case? Well- Certainly a possibility. Yeah, yeah. It's not certain, but in a district court's analysis, it's sort of a possibility. Yeah. Again, not dispositive, but that Korean law might end up being the applicable law, right? Yeah, I agree that there's a possibility of that. But underlying our fraudulent conveyance schemes is the violation of the TRIA. So even if it goes to Korea, if the fraudulent conveyance is Korean law, we're still going to have- Korean courts are still going to have to examine U.S. law under the TRIA. Why wasn't the district court entitled to credit Professor Kwon and Suk that under Korean law, your clients would be able to enforce the judgment in Korea? And even if they couldn't enforce the judgments in Korea, there are underlying causes of action in Korea that would allow them to still collect. Why couldn't the district court credit that? Well, I think, yeah, as we state in our brief, I think the way the experts phrase their belief, they only express their opinions in terms of possibilities, not probabilities. So we don't think that got to the burden of proof necessary to show Korea's an adequate alternative forum. And as we noted, between their initial declarations and the reply brief, there is a- On paragraph 76, the expert says, I believe the final judgment plaintiffs obtain is likely, not possibly, likely to be recognized in Korea, considering the following factors, and then goes through several factors. Is that a likelihood? So, and are you citing from the initial declaration? Paragraph 76 of the one that was filed on April 13th of 2021. I don't know what- Okay, yeah, so between the initial declaration and the reply declaration, there is a second Korean lower court decision that failed to find an exception to sovereign immunity, you know, where Japan invaded, you know, and abducted women. They found that that was, did not- They found that you couldn't sue Japan even under those facts. So this is a comfort women cases. So the first one before the- occurred before the first declaration, and that one found that Japan did abrogate sovereign immunity through those acts. But after the first declaration, there was a second comfort woman case, and that found that Japan was still entitled to sovereign immunity. So I think in the reply declarations, I think that both of those experts, you know, they still, I think they mitigated their opinion somewhat. So they changed it to possible instead of likely? Is that what you're saying in the supplemental declaration? Yeah, and I think they both acknowledge it's going to be an issue that's going to have to be decided by the Korean Supreme Court, because there's a split right now in Korea. I thought the district court made an error of law in discrediting the plaintiff's expert, Professor Jang. The district court discredited him and preferred the defendant's expert on the basis of her belief that Professor Jang had treated some proposed pending legislation as if it were past legislation. And it seems to me that's just a misinterpretation of his testimony, that he didn't, it's a misunderstanding to treat him as having believed that pending legislation was past legislation. I just don't see a basis for that. It's a misunderstanding. And that's the basis upon which she discredited him and decided that she preferred the defendant's expert. Do you want to address that? Yeah, I think it is a clearly erroneous finding of fact as well. I mean, it's difficult in the opinion because there's no citation to what forms of basis of that belief. And we address it in our brief, but our experts cited the correct statutes. They're experts and acknowledge our experts cited the correct statute. They have a disagreement as to the import of that statute, but our expert didn't make an error. And in fact, it's their experts who are relying on proposed legislation to argue that punitive damages will be available in Korea. So yeah, I don't understand the basis for that finding by the district court. All right. Thank you. Can you reserve two minutes for rebuttal? Thank you. Thank you, Your Honor. And we have Mr. Palmore. Is that how you pronounce it? It is. Thank you, Your Honor. May it please the Court. Joseph Palmore for Industrial Bank of Korea. The district court did not abuse its broad discretion in concluding that this litigation about financial transactions that took place in Korea and an attempt to take assets that are located in Korea should be litigated in Korea. The reason that there's so much deference afforded to district courts in this setting is they're the ones who would actually have to try the case. And at the very beginning of the last argument, Judge Bianco, Judge Chen, you asked questions about this. And that reflects Irigoye's statement that when you look at form nonconvenience, you have to look at precisely what are the issues that would be tried. Here, these are principally fraudulent conveyance claims which will require things like was there fair consideration? What was the nature of the transactions? What was the intent of those who were involved? And the plaintiff's complaint here is chock full of allegations about things that happened in Korea, talking about the Zong conspiracy to create fake accounts in Korea, fake documents in Korea, pay bribes in Korea. That's paragraph 69 through 72. How Zong corrupted the government review process for these transactions, that's paragraphs 49 and 123. Counsel said that, well, IDK has already produced all this evidence. That's not correct. If you look at the Kim Declaration, JA 378, who's the chief compliance officer for IDK, he explains that the evidence that went to the SDNY came through the Mutual Legal Assistance Treaty. So it went from parties in Korea to Korean prosecutors and government officials and then over to the SDNY. And there are strict limits on what can be done with that. It can't just be handed over as the court's questions reflected. So just so I understand, those documents came from Korea originally. They're here now, but you're saying they can't be used by the plaintiffs in this case? I can't speak to where they are now. They were in the custody of the SDNY, and that case is over. There was a deferred prosecution agreement. The information was dismissed earlier this year because IDK complied with all its terms. So that's a closed case. But the point is that it's not so simple as plaintiffs would suggest, that they can just go to the SDNY and take the boxes out and use that. What about the State Department? That was the same issues. It was all about, and this is a very important point, Judge Chin, it was all about the adequacy of the anti-money laundering protocols and procedures at the single IDK branch in New York. If you look at the information, that's all it was about. It wasn't about the broader claims, about sanction violations or anything else. And the relevant witnesses and documents for those things, those allegedly fraudulent transactions, are in Korea. The Kim declaration at J380-381 actually lists the witnesses who might be relevant based on the allegations in the complaint and shows that they're in Korea. Documents are there. They're written in Korean. And Irigori calls for an assessment, even at step one, of looking at the connection between not just the plaintiffs but the case and the forum. And the district court here didn't abuse its discretion by looking at both aspects in that step one. When we get to step two, I want to make clear that there was some discussion in the first case about the burden of proof on the fairness of the Turkish legal system. That's not an issue in our case. Plaintiffs didn't show, didn't even argue that there was any unfairness in the Korean legal system. It's very well regarded. It's the fourth most efficient in the world. So that aspect is not present here. Instead, there was a battle of the experts about the adequacy of remedies that would be available in Korea. And our expert had the better of that argument and explained that, two things. One, that the judgments would likely be enforced in Korea. And two, that enforcement of the judgments wasn't actually even necessary for the fraudulent conveyance, analog claims, tort, revocation, separation. Can you address your adversary's argument that through the subsequent decisions that the likelihood was reduced, the likelihood that it would be enforced? Because I didn't see that in the record. Yes, so Professor Suk did address that. So a second opinion came down between the opening declaration and the second declaration. The first decision said Japan enjoyed no sovereign immunity in a Comfort Women case because there's an exception for crimes against humanity. And our experts showed that that would be applied here. There was a second case that came out the other way. But critically, and Professor Suk explains this in his supplemental declaration, this is JA 1001 to 1002, that the part of the rationale of that second Comfort Women case was that there was a diplomatic resolution between Japan and Korea that provided an alternative route to remedies. And what Professor Suk said is in a case like this one, where there is no diplomatic route, there is no alternative ground or a basis for a remedy, that Korean courts would find the waiver of sovereign immunity. So the professor didn't switch the conclusion? He didn't alter the ultimate conclusion? He adhered to his conclusion. He recognized there was a disagreement and that the Korean Supreme Court would ultimately have to weigh in. But he didn't change his view. And I don't think legal certainty is required here. I think the courts talk about a justifiable belief, and the experts gave much more than that. Judge LaValle, you asked about the dust-up about the Korean legislation and the availability of punitive damages. That was really just a minor part of the district court's analysis. The core part was the district court credited our experts saying that the judgments would be enforced. There was a fight about whether you could collect punitive damages or not under Korean law, and that's really neither here nor there. The law is quite clear that just because a foreign jurisdiction doesn't make available, for instance, punitive damages. I don't think that's the point. I think the point is that the district court discredited the plaintiff's expert witness on the basis of having misunderstood part of his testimony. Not that the issue that it related to is of particular significance, but simply that the district court made an error of law in the interpretation of his evidence and said he made a mistake that he in fact had not made and used that as a basis for simply discrediting him and preferring the defendant's expert witness. Two responses, Judge LaValle. That's not quite how I read the district court's opinion. You're right that the district court talked about the credibility, but it had already made the findings about who was right about the enforceability of the judgments, and that was the core. Second, there was no error on the part of the district court. Our expert explained in a supplemental declaration that their expert was simply wrong in his reading of Korean law, and to the extent he suggested that Korean law would forbid all punitive damages, he was relying on a proposed law, not the one that was actually adopted, because the one that was actually adopted reflected a more nuanced view where punitive damages, which have historically not been available in Korea, are increasingly available, and that that new law reflected that, and it opened the door to punitive damages in a case like this one. But, of course, even if they weren't available, that wouldn't change the adequacy of the forum. Can I just ask you to address the same question I asked to the prior health bank counsel about why there shouldn't potentially be, and Judge LaValle asked some questions about this as well, a stronger preference shown to plaintiffs when they're terrorism victims and they're seeking to enforce a judgment related to a terrorist attack? Well, a couple of points on that, Your Honor. One is, as Mr. Williams said in the first case, the kind of cause of action and the exception to sovereign immunity is for actions against state sponsors of terrorism. So that's how they got into court on their underlying Iran actions. Of course, Korea is not that. It's a U.S. ally. Second, just because there's an exception to sovereign immunity doesn't change the analysis under form nonconvenience. This court made that point in the energy case. We submitted it as a 28-J. I know, but that's not – for example, in the WeWa case, they cite the fact that in that case we said because it deals with international human rights abuses, that there should be some special deference shown for cases in that category of utilizing U.S. courts. So I think it would be more along those lines. How would it be different if we were along the lines of WeWa, say, and in terrorism cases we feel we could conclude the same thing? Well, Your Honor, a couple points about WeWa. First of all, WeWa then goes on to say we're not saying that form nonconvenience can't apply or is even significantly affected, and then energy gives exactly that reading to WeWa. It says WeWa doesn't change the form nonconvenience analysis just because there's an exception to sovereign immunity  Is it possible to – is it convenient to litigate here and exercise that jurisdiction? But there's a second really important point here, which is that the adequacy – because the court's questions are understandably about will there be relief afforded to these plaintiffs or is it possible for them to get it? And energy makes this point, too. That's baked into the form nonconvenience analysis. That's step two. Step two of the form nonconvenience analysis said, is there an adequate remedy? So if there is no adequate remedy for these plaintiffs or any other who's a plaintiff in a form nonconvenience case, then the case simply won't be transferred. But here the court, district court, acted well within its discretion in concluding that there was a remedy in Korea. So there – some of the transactions took place in Korea, clearly, but there are allegations that the New York branch and other New York banks were used to convert some of the disguised assets to U.S. dollars. Are those – why aren't those sufficient New York connections to – I mean, won't there be some New York witnesses involved? No, Your Honor, because the question isn't isn't there some tangential New York connection. It's like where's the gravamen of the evidence and the witnesses? What would they actually have to prove under the elements of the claims that they brought? And nothing about those transactions. The fact that the money transited through New York as trillions of dollars transit, I think, every day through New York doesn't have anything to do with what they need to prove that these underlying transactions, the transfers into the CBI want account and out of the CBI want account into other accounts in Korea were fraudulent. So there's no – there's no – that doesn't get them anywhere in terms of what they have to prove. And the New York Court of Appeals and Mosharuk Bank that we cite in our brief and the district court cited makes this very point that just because of the happenstance that an allegedly fraudulent transfer passes through New York doesn't give New York an interest in regulating that transaction and doesn't implicate New York's policy in favor of the integrity of its banking system. Here, the transactions, the witnesses, the allegedly forged documents, the conspirators are all in Korea and the district court acted well within its discretion in concluding that the case should be litigated there as well. Thank you, Mr. Palmore. And Mr. Travers, you have two minutes from the bottom. Thank you. Thank you, Your Honor. First, I want to address – sorry. First, I want to address the location of the evidence. In the Deferred Prosecution Agreement JA622, the U.S. government, as stipulated to by IBK, first I note that IBK hired a forensic accounting firm to conduct an extensive internal review, including a review of transactions involving IBK's CBI Wan account that was provided to the U.S. prosecutors. We don't have to get that from the U.S. prosecutors. We're going to issue discovery to IBK and ask them to produce that to us. They've already produced it in New York. It's not a burden to just turn around and produce it to us. And it also goes on to say IBK produced documentary materials to the agencies in response to subpoena from the NYAD and a mutual legal assistance request. So IBK collected those documents and provided them to the U.S. Attorney's Office. So we're not going to ask – we don't have to ask the U.S. Attorney. We're going to issue discovery to IBK. They already produced that document in New York. So I want to address the – quickly address the second declaration by IBK's experts, and it's on JA974 where the expert says, I believe there is considerable possibility that Korean Supreme Court may recognize an exception to sovereign immunity. So that's where I believe the expert mitigated his opinion somewhat, and it doesn't get them past that burden of proof. And I just want to end with the U.S. interest isn't limited just to body compensation for our plaintiffs. These civil lawsuits, as stated by Congress, serve the national security interests of the United States by deterring the sponsorship of terrorism. And IBK, by laundering money, undermined that national security interest of the U.S. Thank you. Thank you, Mr. Travis. Thank you, Mr. Palmore. We'll reserve the decision. Have a good day.